In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 14-2628

CHARLES BEAL, JR.,

*Plaintiff-Appellant,*

*v.*

JAMES BELLER and MATTHEW STRELOW,

*Defendants-Appellees.*

---

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 12-CV-01146 — **Lynn Adelman**, *Judge.*

---

ARGUED NOVEMBER 8, 2016 — DECIDED FEBRUARY 10, 2017

---

Before WOOD, *Chief Judge*, and POSNER and ROVNER, *Circuit Judges*.

WOOD, *Chief Judge*. Most Fourth Amendment issues arise when a criminal defendant files a motion to suppress evidence allegedly collected in violation of its standards, but this is not such a case. Charles Beal, Jr., has brought a civil action under 42 U.S.C. § 1983, in which he asserts that two detectives on the Kenosha, Wisconsin, police force lacked any justification recognized by the Fourth Amendment to stop him, to

frisk him, and then to conduct a more thorough search. The
district court granted summary judgment for the Detectives.
It found that the tip on which they acted was not anonymous,
as Beal contended, and that their actions were permissible un-
der *Terry v. Ohio*, 392 U.S. 1 (1968). We conclude that the criti-
cal facts were genuinely disputed, and thus we reverse and
remand for further proceedings.

**I**

The underlying facts are straightforward; we present them
in the light most favorable to Beal, as we must. See *Tolan v.
Cotton*, 134 S. Ct. 1861, 1863 (2014) (per curiam), *Anderson v.
Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). On September 11,
2007, Kenosha Detective Matthew Strelow received an anon-
ymous tip that an African-American man in a yellow shirt was
selling heroin on the corner of 58th Street and 11th Avenue,
known as a "high crime area." Without taking any steps to
corroborate the tip, Strelow and his partner, Detective James
Beller, drove an unmarked car to that intersection. There they
saw Beal, who matched the tipster's description, standing in
a driveway talking to a woman. (It later turned out that he
was at his aunt's residence and was talking to a relative.) The
Detectives parked their car and walked up to Beal. They told
him that they had received an anonymous tip that he was sell-
ing drugs and asked him to identify himself. He did so with-
out objection.

At that point Beller grabbed Beal's left wrist and Strelow
frisked him. Just before Strelow began, Beal's right hand had
been in his pocket. Strelow asked him to remove his hand, and
Beal immediately complied. Strelow admitted that Beal's "de-
meanor was cooperative." As he carried out the frisk, Strelow
felt an object that he recognized as a pair of keys, and he also

felt what he described as a soft bulge that felt like tissue. It was immediately apparent that neither item was a weapon. Nevertheless, Strelow next emptied Beal's pocket, removed a set of keys, two bunched up tissues, a photo ID, and miscellaneous letters. He examined the keychain and an attached flashlight, which he discovered had been hollowed out and now contained four small baggies with a substance the detective believed was heroin. His examination of the tissues revealed no further drugs, but there were two empty plastic bags. Beal had no money.

Strelow arrested Beal based on the results of the pocket search. Beal was charged with possession of heroin in state court. He moved to suppress the evidence on the ground that the Detectives had violated the Fourth Amendment by stopping him without sufficient cause, by frisking him even though there was no reason to think he was armed or dangerous, and by searching his pocket after confirming that he was unarmed. After holding a multi-day hearing on the motion, the Wisconsin court suppressed the evidence and dismissed all charges against Beal.

**II**

Beal filed this action against Beller and Strelow under 42 U.S.C. § 1983 on October 19, 2012, comfortably within the six-year period that applies to cases in Wisconsin. See Wis. Stat. § 893.53; *Malone v. Corrections Corp. of Am.*, 553 F.3d 540, 542 (7th Cir. 2009). He verified his complaint, swearing that the account it contained of the relevant events was "accurate and true … subject to the penalty of perjury." Later he filed an amended complaint, which also was verified under penalty of perjury. Beller and Strelow (to whom we refer collectively as the Detectives unless the context requires otherwise) filed a

motion for summary judgment on the basis of qualified immunity. Beal initially had some problems obtaining the records from his suppression hearing, but he ultimately received them and submitted them in opposition to the motion. This was not enough, however, to stave off defeat. Going beyond the qualified immunity ground the Detectives had asserted, the district court granted summary judgment for them on the ground that "no reasonable jury could find that plaintiff's Fourth Amendment rights were violated" at all. (This finding risked labeling the state court as unreasonable, given the fact that the state court had made precisely this finding when it granted Beal's motion to suppress. But we do not rest our decision on this uncomfortable point.)

In its opinion, the district court made a number of critical assumptions, all unfavorable to Beal. For example, it said that "Beller knew who the informant was and that the informant had previously provided other officers in the police department with reliable information." Describing the Detectives' arrival at the house, the court said that "Plaintiff saw the officers. He made eye contact with Strelow and immediately put his hand in his right front pocket and turned as if to walk away." With respect to the pat-down search, the court accepted that Strelow "believed the soft bulge [he felt] was a number of individually wrapped packages of narcotics wrapped in tissue paper." Based on that account of the facts, the court concluded that the Detectives had reasonable suspicion, for *Terry* purposes, to detain Beal briefly and to frisk him. The results of that frisk, it continued, provided probable cause for Beal's arrest. Those findings, taken together, were enough to doom Beal's section 1983 case. With the help of recruited counsel, whose efforts the court greatly appreciates, Beal has appealed.

**III**

The most important question on this appeal is whether the undisputed facts showed that the tip on which the Detectives acted came from a known source, or if there is a genuine dispute of fact over the question whether the source was anonymous. This is critical, because if the tip was anonymous, then the rule of *Florida v. J.L.*, 529 U.S. 266, 268 (2000), which holds that an anonymous tip without more does not justify a stop-and-frisk, comes into play. If the tip came from a known source with a proven track record, the legal analysis is markedly different.

Beal's initial verified complaint contains the following assertions of fact on that point:

> ¶ 7. Plaintiff was standing in his aunt's driveway talking to a family member Lisa when two detectives approached the plaintiff and stated we have an annonymous [*sic*] tip that you are selling drugs.

> ¶ 8. An annonymous [*sic*] tip lacks sufficient indictia [*sic*] of of [*sic*] reliability and aside from the alleged tip there was no other basis nor probable cause for said detectives to stop, frisk and seize any contents from Plaintiff Beal's pocket, nor arrest the plaintiff.

Beal's handwritten amended complaint (filed December 21, 2012), which was also verified, offered this account:

> ¶ 7. Plaintiff was standing in aunt's driveway talking to a family member Lisa when two detectives approached my cousin and I and stated Come to the vehicle. They stated "we recieved [*sic*] a phone call you are selling drugs."

¶ 8. An annonymous [*sic*] tip lacks sufficient indic-
tia [*sic*] of reliability and aside from the alleged tip
there was no other basis nor probable cause for said
detectives to stop, frisk and seize any contents from my
pockets, nor arrest me.

Paragraph 7 of the initial complaint offers a first-hand re-
port from Beal about what the Detectives said about the tip: it
was anonymous. Paragraph 8 is more of a legal conclusion,
but it provides context for paragraph 7 and reinforces the fact
that Beal has competent testimony to show that the tip was
indeed anonymous. The Detectives argue, however, that we
cannot rely on the first complaint, because an amended com-
plaint was filed and it omits the critical word "anonymous"
in its version of paragraph 7. They rely on the rule under
which "facts or admissions from an earlier complaint that are
not included in a later complaint cannot be considered on a
motion to dismiss." *Scott v. Chuhak & Tecson, P.C.*, 725 F.3d 772,
783–84 (7th Cir. 2013). *Scott* also notes that "where the original
complaint and an amended complaint contain contradictory
or mutually exclusive claims, only the claims in the amended
complaint are considered." *Id.* at 784.

For several reasons, however, the *Scott* rule does not apply
here. First, there is a distinction between an ordinary com-
plaint that serves as a pleading, and a verified complaint. The
former type is what *Scott* was describing. For pleading pur-
poses, once an amended complaint is filed, the original com-
plaint drops out of the picture. See, *e.g., Wellness Community–
National v. Wellness House*, 70 F.3d 46, 49 (7th Cir. 1995). But a
verified complaint is not just a pleading; it is also the equiva-
lent of an affidavit for purposes of summary judgment, be-

cause it "contains factual allegations that if included in an affidavit or deposition would be considered evidence, and not merely assertion." *Ford v. Wilson*, 90 F.3d 245, 246 (7th Cir. 1996). The verified complaint does not lose its character as the equivalent of an affidavit just because a later, amended complaint, is filed. *Boxdorfer v. Thrivent Fin. for Lutherans*, No. 1:09-cv-0109-DFH-JMS, 2009 WL 2448459, at *2 & n.2 (S.D. Ind. Aug. 10, 2009) (Hamilton, D.J.).

Our situation is a little different from the one in either *Ford* or *Boxdorfer*. In *Ford*, there was no amended complaint, and so nothing with which to compare the original verified complaint. In *Boxdorfer*, there was an amended complaint, but it was not verified, and so the only verified document before the court was the original complaint, on which the court relied in deciding the case. We have two complaints, and both are verified. This is no more remarkable than having two affidavits from the same person in a case. There is no rule against multiple affidavits, and so no rule against multiple verified complaints. In a case similar to ours, where a *pro se* litigant filed verified original *and* amended complaints, the Eighth Circuit considered both versions in a decision reversing summary judgment for the defendants. See *Hartsfield v. Colburn*, 371 F.3d 454, 455–57 (8th Cir. 2004). We will do the same.

The next question is whether the two verified complaints, as we put it in *Scott*, contain contradictory or mutually exclusive assertions. The Detectives argue that they do, because the word "anonymous" is missing from ¶ 7 in the amended complaint. This is not, however, a fair reading of Beal's complaint. Shortly after it decided *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court reaffirmed that "[a] document

filed *pro se* is to be liberally construed, … and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam). We review Beal's complaint with this in mind. First, there is nothing inconsistent about saying "we have an anonymous tip that you are selling drugs," and saying "we received a phone call you are selling drugs." At worst, there is a detail missing in the second version, but the phone call easily could have been anonymous. Second, the broader context shows that Beal intended no such shift between the original and the amended complaint. Paragraph 8 of the two versions is practically identical. There would have been no reason to include it in the amended complaint if Beal was abandoning his position that the Detectives told him that the tip was anonymous. Since there is no inconsistency between the two versions of the verified complaint, there is no reason why Beal cannot rely on his initial assertion that he was told that the tip was anonymous.

Moreover, this was not Beal's only evidence that the tip was anonymous. He pointed to substantial circumstantial evidence that buttressed his account. For example, the sworn criminal complaint in the state-court action charging him with heroin possession said that Strelow and Beller "received an anonymous tip regarding an individual selling heroin" and that Beal matched the description provided by "the anonymous tipster." The Detectives argue that the prosecutor was just mistaken, but that is a jury point, not something that can be resolved at summary judgment. They also contend that the prosecutor relied on Strelow's arrest report, which says only "we received a tip." This point, too, might be called to a jury's attention but is of little moment here. In response, Beal could

note that he was arrested on September 11, 2007, and the criminal proceeding did not begin until December 2007. There was plenty of time for the prosecutor to flesh out the details of the arrest report with Strelow before the complaint was filed. It is telling, also, that the Detectives' reports make no mention of the use of an informant—that assertion did not enter the picture until the suppression hearing, which was resolved by a January 19, 2009, order granting the motion.

Other details do not carry much weight on their own, but a trier of fact could think that they corroborate Beal's account. At the suppression hearing, Beller testified that he took the tipster's call, that he was required to write a report on its contents, that he did so, and that the report stated that he knew the informant. Unfortunately, however (he told the state court), the report went missing. He explained this awkward fact by saying "[r]eports get lost once in awhile [*sic*]," and described himself as "flabbergasted" by the disappearance of this one. Far from attempting to remedy this problem by providing some other form of corroboration, the prosecutor refused to identify the informant at the suppression hearing— a move the Detectives have tried to justify in this court by citing unspecified "strategic" reasons "that are not part of the record."

The bottom line is that there is a genuine issue of fact on the question whether the tip that led the Detectives to Beal was anonymous. Even though such questions are resolved by the court in a suppression hearing in a criminal case, in a civil action under section 1983 they are subject to the ordinary rules governing summary judgment. Taking the facts in the light most favorable to Beal, we must assume that the tip was anonymous and uncorroborated.

That takes us directly to *Florida v. J.L., supra*, 529 U.S. 266. The first question is whether a trier of fact would be compelled to find that the Detectives were authorized, based on the knowledge they had, to stop and frisk Beal. If we were to answer that question in the affirmative, then we would need to consider whether the additional search of Beal's pockets after the initial frisk was permissible. Because we answer it in the negative, however, we need not address the latter points, and Beal's civil suit must go forward.

*J.L.* reached the Supreme Court from a criminal proceeding in which the defendant was seeking to have evidence suppressed. Its holding, however, is central to the issue before us. The facts will sound familiar. On October 13, 1995, an anonymous caller reported to the police that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun. *Id.* at 268. There was no audio recording of the tip, and nothing was known about the informant. Despite this dearth of information, the police responded and found a young man of that description at the bus stop. They approached him, immediately ordered him to put his hands up, frisked him, and seized a gun from his pocket. He was charged under state law with carrying a concealed firearm without a license and possessing a firearm while under the age of 18. At the trial level, he successfully moved to suppress the gun as the fruit of an unlawful search; the intermediate appellate court reversed, but the Supreme Court of Florida reinstated the suppression order. The U.S. Supreme Court affirmed that decision.

It began by reaffirming its earlier holding in *Alabama v. White*, 496 U.S. 325 (1990), that "an anonymous tip alone sel-

dom demonstrates the informant's basis of knowledge or veracity." *Id.* at 270 (quoting *White*, 496 U.S. at 329). The tip in *J.L.*, it continued, "lacked the moderate indicia of reliability present in *White* and essential to the Court's decision in that case." *Id.* at 271. The indicia in *White* to which the Court referred included extensive detail about the suspect and accurate predictions about her future movements. Critically, the information reliably pointed to the illegal activities at issue. In contrast, as the Court pointed out, it is no great task to provide an accurate description of someone standing on a corner.

The Court also rejected a special rule for firearms cases, using language that foresees Beal's situation: "If police officers may properly conduct *Terry* frisks on the basis of bare-boned tips about guns, it would be reasonable to maintain under the above-cited decisions that the police should similarly have discretion to frisk based on bare-boned tips about narcotics. As we clarified when we made indicia of reliability critical in *Adams* [*v. Williams*, 407 U.S. 143 (1972)] and *White,* the Fourth Amendment is not so easily satisfied." *Id.* at 273.

The Detectives urge that this case differs meaningfully from *J.L.*, even accepting the facts that favor Beal. First, they note that they did corroborate the location and description of the person described in the tip. Second, they assert that tips are recorded and thus, as in *Navarette v. California*, 134 S. Ct. 1683 (2014), they should be deemed reliable. Third, they attach significance to the fact that Beal was in an area known for drug trafficking. Fourth, they rely on Strelow's testimony that Beal looked away from him, turned to walk away, and put his right hand in his right pants pocket. Last, the Detectives said that the tip referred to Beal by name.

Once again, while a jury might find that these points support the Detectives' actions, it would not be required to do so. The facts that they corroborated the location, that they knew the area to be one associated with drug trafficking, and that the tipster identified Beal by name, do nothing more than the tip in *J.L.* accomplished. Here is the Supreme Court's explanation of why that is insufficient:

> An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.

529 U.S. at 272. The missing link here is any indicium of reliability related to the assertion of illegality. We have not yet reached the point at which every person found in an area known for drug trafficking can be stopped and frisked, just because the person happens to be there.

That leaves the Detectives' second and fourth points, which we take in turn. In *Navarette*, the Supreme Court considered the question whether a call to the 911 service, coupled with some effort by the police to corroborate the caller's information, was enough to justify a traffic stop for suspicion of driving while intoxicated. The 911 caller reported that a vehicle had run her off the road. The caller furnished a detailed description of the vehicle, complete with license plate number. A short time later, in an area consistent with the 911 caller's information, the state police found the suspect vehicle

(a pickup truck) and pulled it over. As they approached the truck, they thought they smelled marijuana. They were correct: a search of the truck revealed some 30 pounds of marijuana in the truck bed. Arrests and prosecution followed, and the defendants moved to suppress the marijuana based on the *J.L.* principle.

The Supreme Court upheld the decision of the California Supreme Court, which had found the stop justified by reasonable suspicion. The Court found this case closer to *White* than to *J.L.*, because of the presence of details that corroborated the criminal aspect of the anonymous tip. It found the fact that the caller was an eyewitness reporting an immediate traffic violation telling; and it also found "the caller's use of the 911 emergency system" to be an "indicator of veracity." *Navarette*, 134 S. Ct. at 1689. Even if, at first glance, the caller might appear to be anonymous, there are features of the 911 system that permit a later identification. Calls can be traced and recorded. For some time cellular carriers have been required to relay the caller's telephone number to the 911 dispatcher and to identify her geographic location. The Court concluded that "[g]iven the foregoing technological and regulatory developments, however, a reasonable officer could conclude that a false tipster would think twice before using such a system. The caller's use of the 911 system is therefore one of the relevant circumstances that, taken together, justified the officer's reliance on the information reported in the 911 call." *Id.* at 1690.

No one in the present case, however, asserted that the tipster used Kenosha's 911 system. The emergency nature of the 911 call on which the *Navarette* Court relied is therefore miss-

ing. In addition, no evidence in the record suggests that Kenosha has a dedicated tip line (unless the mysterious Gang Unit telephone functions this way), or if it does, that it has the tracing capabilities that are mandated for 911 services. At most, we could assume that the police department has a recording of an anonymous male or female voice. That is not enough, in our view, to trigger *Navarette*'s rule.

As for Strelow's description of Beal's behavior, all that needs to be said is that Beal disputes this account. Beal stated at his deposition that his right hand was already in his pocket when the Detectives arrived, and that he was cooperative throughout the encounter. It does not help the Detectives that Strelow also testified that he and Beller were trying to sneak up on Beal, and that Beal did not notice the unmarked car's arrival. Even if Beal did turn away from the Detectives for a moment as he stood in his aunt's driveway, it is hard to find anything suspicious about that. Beal's testimony, we add, is obviously competent to describe what he himself was doing.

**IV**

Once again, the question before us is not whether the evidence seized from Beal as a result of the Detectives' stop-and-frisk should be suppressed. That question arose in the state criminal proceeding, and it was resolved favorably to Beal. (The Detectives are not bound by that ruling, since they are being sued in their individual capacity; but it bears noting that the state court's conclusion is of no help to them.) The question we must resolve is whether summary judgment in the Detectives' favor in this section 1983 suit was proper. We conclude that it was not. The validity of their decision to stop Beal will depend on the trier of fact's resolution of a number of disputed facts: Was the tip anonymous? Did Beal take any

action that was sufficiently suspicious to justify the stop? Did the Detectives have any other information that provided at least reasonable suspicion to stop (and then frisk) Beal? The existence of these disputed facts is also enough to defeat the Detectives' assertion of qualified immunity. See, *e.g., Johnson v. Jones*, 515 U.S. 304 (1995).

We make no predictions about the ultimate outcome of a trial. For present purposes, it is enough to say that summary judgment for the Detectives should not have been granted. The judgment of the district court is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.